IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 13, 2014

IN RE AUSTIN A., ET AL.

Appeal from the Juvenile Court for Washington County
No. J14271, J14272     Robert D. Arnold, Judge

_____

No. E2014-00910-COA-R3-PT-FILED-NOVEMBER 17, 2014

_____

This case concerns the termination of the mother's parental rights.  We have determined that the record contains clear and convincing evidence to support terminating the mother's parental rights on the ground relied upon by the trial court.  The record further supports the conclusion that terminating the mother's parental rights is in the children's best interest.  Accordingly, we affirm the findings of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

C. Brad Sproles, Kingsport, Tennessee, for the appellant, Amanda P.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Michelle Caggiano, Elizabethton, Tennessee, Guardian ad Litem.

## OPINION

## I. BACKGROUND

The children in this appeal – Austin Matthew A. (d.o.b. 7/20/2010) ("Matthew")[1] and Xander Kain A. (d.o.b. 10/8/2012) ("the Children") –  were brought into state custody on May 15, 2013.  Matthew's father is Scott A., whose parental rights were terminated in an earlier proceeding.  Xander's father is Andrew A., who surrendered his parental rights.  On the date the Children came into custody, the police arrested Amanda P. ("Mother") and Andrew A. for aggravated child abuse of Matthew.  The following day, the Department of Children's Services ("DCS") filed a petition to adjudicate dependency and neglect.  On August 8 and September 26, 2013, DCS filed petitions to terminate Mother's parental rights to the Children.  The trial court determined that the Children were dependent and neglected and that Mother severely abused Matthew. A no-contact order prohibiting contact between Mother and the Children was entered by the court.[2]

The trial was conducted on March 13, 2014.  Jennifer Smith, the Children's DCS Family Service Worker, described the abuse suffered by Matthew:

> His face was severely . . . swollen . . . In the photographs he could not open his eyes. He had bruises all over him in different [stages of healing], so it appeared they may not have been from that initial incident. . . .  Bruising, really bad, discolored.

She related that Matthew was in the hospital "between five and seven days."  Ms. Smith noted that Mother has pending criminal charges stemming from the abuse allegations.  According to Ms. Smith, Mother has not paid any child support for the ten months the Children have been in foster care, and she is "not aware of any" changes Mother has made in her conduct or circumstance that would make it safe for the Children to be returned to her care.

Ms. Smith testified that the Children were in a pre-adoptive home and doing well. She noted the Children had bonded to their foster parents and that the couple desired to adopt them.  Ms. Smith acknowledged that Mother was in contact with DCS and brought gifts for the Children on Christmas, Halloween, and their birthdays.  She observed:  "I mean I believe

_____

[1]Orders of record and witness testimony refer to Austin Matthew by his middle name.

[2]This was also a bond condition in her criminal aggravated child abuse proceeding.

that she loves her children . . . and that's showing. She wants to know how they are doing, wants to give them gifts, but at the same time, she didn't protect her children, in my eyes."

Robin C. ("Foster Mother") testified that the Children had been placed with her for nine months and "[t]hey are doing wonderful" in her home. When Matthew first came into her care, Foster Mother recalled that "he was thin, really thin . . . he would hide food, and we would find it days later, you know. I'd find it in a closet or under his pillow or under his bed." His issues with food hoarding have been resolved. She notes that Matthew is in speech and occupational therapy and "is talking really well." Foster Mother noted that the Children are particularly bonded to her and that Xander in particular gets very upset when she leaves. She expressed concern that Matthew would regress if removed from her home. Foster Mother told the court that she and her husband love the Children and hope to adopt them.

Mother testified that she is now living with her fiancé and his 2-year-old son.[3] She is working for 30-35 hours a week at Sammons Restaurant in Elizabethton, Tennessee, making $7.25 an hour. She stated that she was scheduled to take a parenting class at Agape after the conclusion of the trial. Mother related that she had been prescribed Klonopin for anxiety and depression and had been seeing a therapist at Watauga. According to Mother, she contacted Ms. Smith at DCS weekly by phone.

In describing her life prior to the abuse incident, Mother told of taking the Children to the park and reading to them. She related no notice of any danger in leaving the Children with Andrew A. – he was watching them because she was working long hours as the only source of income for the household. She admitted that she was still facing criminal charges for the abuse. She further acknowledged regular contact with and residing next door to her stepfather, a registered sex offender who had sexually abused her when she was fifteen. She also admitted to permitting the Children to visit with her mother and stepfather regularly.

On April 24, 2014, the trial court terminated Mother's parental rights to the Children. The trial court made the following conclusions of law:

> Pursuant to T.C.A. 36-1-113(g)(4), there is clear and convincing evidence that [Mother] perpetrated severe child abuse against the minor child, Matthew A[.], the same being stipulated to by all parties as a finding in a final order of this Honorable Court, which was not appealed, and thus res judicata.
>
> Pursuant to T.C.A. 36-1-113(g)(4), there is clear and convincing evidence that

---

[3]The son resides there part-time.

Xander A[.] is the half-sibling of the minor child, Matthew, and that Xander was residing permanently in the home when the incident of severe abuse took place.

On the best interest ground, the court made the following findings of fact:

It is in the [C]hildren's best interest for termination to be granted as to [Mother], because she has not made changes in her conduct or circumstances that would make it safe for the [C]hild[ren] to go home. The Court finds that [Mother] was arrested in conjunction with the injuries which gave rise to the removal of the [C]hildren. The Court finds that, according to the testimony of [Mother], she is currently living with her fiancé, . . . with whom she has been engaged for two (2) months. They have lived in this home for six (6) months. She is not listed on the lease to this home. This home is a two (2) bedroom residence. One bedroom belongs to [Mother] and [fiancé], while the other belongs to [fiancé]'s son, who often stays with them. The Court finds that there is not sufficient room for these minor [C]hildren in [Mother]'s current residence.

The Court finds that, based upon the testimony of [Mother], she is presently working at Sammon's Restaurant in Elizabethton, Tennessee. She works approximately thirty (30) hours per week and makes seven dollars and twenty-five cents ($7.25) per hour at this job. Both [Mother] and [fiancé]'s employment and work schedule is such that they would be unable to care for the minor [C]hildren in the home without additional childcare and babysitting assistance. [Mother] further testified that, were the [C]hildren returned to her care, her brother and his paramour would assist her with childcare. The Court finds that DCS has previously conducted a home study of the aforementioned relative's home, which was made an exhibit in this cause. This home study identified numerous concerns for the safety of the [C]hildren in this home. The primary concern with the home was the close relationship between this relative and [Mother]'s stepfather, who is a registered sex offender. The Court also finds that, based upon her testimony, [Mother] has chosen to reside next door to her stepfather, who is a registered sex offender[] . . . and has contact with him three (3) to four (4) times per week in violation of the law. Despite her history with her stepfather, [Mother] views her stepfather to be her friend. The Court finds that, after she was released from incarceration, [Mother] chose to live with her stepfather and mother for approximately four (4) months. This is in spite of the fact that she was a victim of sexual abuse by her stepfather, was removed from the care of her stepfather and mother at age fifteen (15). .

. .

The Court finds that, based upon [Mother]'s testimony, after she was released from jail seven (7) months ago, she began seeing a psychiatrist, where she was diagnosed with anxiety and depression. She is currently prescribed klonopin to treat these conditions.

The Court finds that the circumstances that led to the removal of the [C]hildren from the home of [Mother] have not been remedied. [Mother] testified that she has not completed any form of rehabilitative services or tasks to address the issues of dependence and neglect or severe child abuse in her home. Additionally, the Court finds that [Mother] has yet to make adjustments to her conduct or circumstances to make it safe for the [C]hildren to go home. In the seven (7) months since her release from jail on bond, she has not completed any form of parenting skills training. She has not completed any kind of parenting assessment. She has not completed any form of anger management or domestic violence training. She still has outstanding legal charges that have not been addressed.

Based upon the testimony of the [C]hildren's DCS case manager, Jennifer Smith, the Court finds that the Department remains unable to recommend returning the [C]hildren to ]Mother].

Thus, the Court finds, by clear and convincing evidence, that [Mother] has failed to make changes in her conduct and circumstances that would make it safe for the [C]hildren to return to her care, such that it is in the best interest of the minor [C]hildren that her parental rights should be terminated.

It is in the [C]hildren's best interest for termination to be granted as to [Mother], because there is no meaningful relationship between herself and the [C]hildren. The Court finds that, based upon the testimony of Ms. Smith, the [C]hildren have not visited with [Mother] since May, 2013. This is due to a no contact order being placed in effect between the minor [C]hildren and [Mother] . . . . Despite [Mother]'s testimony that she feels she has a close relationship with the [C]hildren, the Court further finds that, based upon the age of the [C]hildren, they have little to no memory of [Mother]. They identify their foster parents as their family. Based upon the testimony of [Foster Mother], the Court finds that [the Children] have not asked for, or about, their [M]other since they were placed into DCS custody for foster care. The Court also specifically finds that, hopefully, the minor child, Matthew, will one day

be able to forget the abuse he suffered while in [Mother]'s care.

Thus, the Court finds, by clear and convincing evidence, that there is no meaningful relationship between [Mother] and the minor [C]hildren, such that it is in the best interest of the minor [C]hildren that her parental rights should be terminated.

It is in the [C]hildren's best interest for termination to be granted as to [Mother], because changing caregivers at this stage of their lives would have a detrimental effect on them. The Court finds that, based upon the testimony of the minor [C]hildren's foster mother, the [C]hildren have developed a strong bond with their foster family. Their lives are settled in this home, and all of their needs are being met there. Due to the actions of the [C]hildren's foster parents, the minor child, Matthew, is now in occupational therapy and speech therapy. Based upon the testimony presented at trial, the Court finds that he was not enrolled in these therapies prior to his removal from [Mother]'s care. According to the testimony of his foster mother, when Matthew came to the foster home, he was only able to say "goodbye" and to "jibber-jabber." To communicate, he would point at things and grunt that he wanted them. Further, based upon [Foster Mother]'s testimony, the Court finds that, when he came to stay in his current foster home, he was very thin, hesitant to interact with men, and withdrawn. He would also hid food to such an extent that the foster parents did not find it for several days.

The Court finds that, based upon the testimony of [Foster Mother], since coming to the foster home, Matthew A[.] has begun to open up, and his food hoarding tendencies have subsided. He has healed from the injuries perpetrated on him while in [Mother]'s care. His physical health has improved. He has gained weight, and is enrolled in day care. He is more outgoing. Further, both of the minor [C]hildren are actively involved in the foster parents' church.

The Court finds that, based upon the testimony of [Foster Mother], the minor child, Xander, stays home with his foster mother during the day, and shares a strong bond with her.

Thus, the Court finds, by clear and convincing evidence, that changing caregivers would be detrimental to these [C]hildren, and is contrary to their best interest, such that it is in the best interest of the minor [C]hildren that [Mother]'s parental rights should be terminated.

It is in the [C]hildren's best interests for termination to be granted as to [Mother], because she has abused or neglected the minor child, Matthew A[.], by perpetrating severe child abuse against him and knowingly failing to protect him from the same. This child is a half-sibling to the minor child, Xander A[.]. . . .

Thus, the Court finds, by clear and convincing evidence, that [Mother] abused, neglected, and severely abused the minor child, Matthew A[.], and that this child is half-sibling to Xander A[.], such that it is in the best interest of the minor [C]hildren that her parental rights should be terminated.

It is in the [C]hildren's best interests for termination to be granted as to [Mother], because there is crime in her home. The Court specifically finds that, based upon the testimony of [Mother], she was arrested on or about May 15, 2013 on charges of aggravated child abuse and neglect against her son, Matthew A[.]. She was incarcerated for approximately three (3) to four (4) months. These charges have yet to be resolved, such that there is the potential for jail time in [Mother]'s future. . . .

Thus, the Court finds that there is crime in the home of [Mother], such that it is in the best interest of the minor [C]hildren that her parental rights be terminated.

It is in the [C]hildren's best interests for termination to be granted as to [Mother], because she has not paid child support consistently. The Court finds that, based upon [Mother]'s testimony, she has not paid any support for the [C]hildren since they entered DCS custody or since her release from incarceration.

Thus, the Court finds that [Mother] has failed to support the minor [C]hildren, such that it is in the best interest of the minor [C]hildren that her parental rights be terminated.

It is in the [C]hildren's best interests for termination to be granted as to [Mother], because the [C]hildren have established a strong bond with their foster parents, who wish to adopt them. The court finds that Matthew is four (4) years of age, and that Xander is seventeen (17) months old. Based upon the testimony of the [C]hildren's DCS case manager, the Court finds that the [C]hildren have remained continuously in this foster home since they were removed approximately ten (10) months ago. This home is free of any issues

of dependency and neglect and severe child abuse. Each and every one of the [C]hildren's needs is being met in this home, and they are safe there. Based upon the testimony of [Foster Mother], the Court finds that their foster parents love the [C]hildren, and that the [C]hildren care deeply for their foster parents. The Court finds that they all share a deep bond with one another. The [C]hildren call their foster parents "mama" and "daddy." They also regularly interact with the foster parents' extended family, with whom they also share a deep affection. They become upset when they are not with their foster parents.

The Court finds that, based upon the testimony of [Foster Mother], the minor [C]hildren are currently placed together. They share a close relationship with each other and are bonded to each other. Further, the Court has previously found that separating these [C]hildren would be contrary to their best interest. They are typical brothers to each other. [Foster Mother] testified that the minor child, Matthew, tells his brother that he loves him. They spend time together. They have a playroom full of toys that belong to them. They play together all the time. The minor child, Xander, is learning to talk. The minor child, Matthew, has his own room. Xander sleeps in the foster parent's room due to his age. The Court also finds that the [C]hildren are thriving in their current foster home environment.

Thus, the Court finds that the Children have established a strong bond with their foster parents, who wish to adopt them, such that it is in their best interest for the parental rights of [Mother] to be terminated.

On May 13, 2014, Mother filed a timely notice of appeal to this Court.


## II. ISSUE

We restate the issue presented to this court as follows:

Whether the trial court properly determined that clear and convincing evidence established that termination of Mother's parental rights was in the best interest of the children.

### III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36–1–113(I)(1)). " '[F]ew consequences of judicial action are so grave as the severance of natural family ties.' " *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug.13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving the termination of parental rights:

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36–1–113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447–48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010) ]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596–97 (Tenn. 2010) (emphasis added).

On appeal, the trial court's specific findings of fact are reviewed de novo upon the record with a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Because of the heightened burden of proof required in termination cases, *see* Tenn. Code Ann. § 36-1-113(c)(l), the appellate court also "must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *In re M.J.B.,* 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004) (citing, *inter alia, Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002)). Regarding the credibility of trial witnesses, the reviewing court should give considerable deference to the trial court's findings. *McCaleb v. Saturn,* 910 S.W.2d 412, 415 (Tenn. 1995); *see Sonet v. Unknown Father of J.D.H.,* 797 S.W.2d 1, 5 (Tenn. Ct. App. 1990) (stating that "the findings of the trial court as to the credibility of the witnesses are entitled to great weight").

The Tennessee Supreme Court requires that, "before a parent's rights can be terminated, there must be a showing that the parent is unfit or that substantial harm to the child will result if the parental rights are not terminated." *In re Swanson,* 2 S.W.3d at 188. "The trial court is required to find only one statutory ground for termination of parental rights," *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn. 2003), which is sufficient to establish substantial harm, or a parent's unfitness and, therefore, to "support a termination of parental rights." *In re Valentine,* 79 S.W.3d at 546. Thus, the State need not prove all of the grounds

alleged. *In re C.W.W.,* 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000).

## IV. DISCUSSION

## A. GROUNDS FOR TERMINATION

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights. The applicable provisions read as follows:

> **36-1-113. Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child . . . by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c) Termination of parental or guardianship rights must be based upon:
>
> > (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> >
> > (2) That termination of the parent's or guardian's rights is in the best interests of the child.
>
> * * *
>
> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . :
>
> * * *
>
> > (4) The parent or guardian has been found to have committed severe child abuse as defined in § 37–1–102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other

child residing temporarily or permanently in the home of such parent or guardian . . . .

Tenn. Code Ann. § 36–1–113(a)-(g)(4). The party petitioning for termination carries the burden of proof. *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). The requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d at 188.

"Severe child abuse" is defined, in relevant part, as:

The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death.

Tenn. Code Ann. § 37–1–102(b)(23)(A)(i). A finding of "severe child abuse" in the underlying dependency and neglect action serves two purposes. First, the finding of "severe child abuse" constitutes an independent ground for the termination of parental rights. *See* Tenn. Code Ann. § 36–1–113(g)(4). Second, a finding of "severe child abuse," even if made during a dependency and neglect action, relieves DCS of its obligation to preserve and reunify the child with the parents. Tenn. Code Ann. § 37–1–166(g)(4)(A).

In its order dated August 8, 2013, the trial court found that Matthew suffered severe child abuse as defined by Tennessee Code Annotated section 37–1–102 (23) perpetuated by Mother and Andrew A. That order is a final order regarding the disposition of Matthew as dependent and neglected on the ground of severe child abuse. Mother did not appeal the finding. A court may apply "the doctrine of res judicata to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action." *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). Thus, where a parent had a full and fair opportunity to litigate the issue of severe abuse in the prior suit and did not appeal, the finding of severe abuse is "a final decision, which the [parent] is barred from challenging." *State Dep't of Human Servs. v. Tate*, No. 01–A–01–9409–CV–00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995). Because Mother did not appeal the trial court's previous finding of severe child abuse, the order became a final order and res judicata.

## B. BEST INTEREST

Having concluded that there was clear and convincing evidence supporting a statutory ground to terminate Mother's parental rights, we must consider whether termination of Mother's parental rights was in the best interest of the Children. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36–1–113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or

controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36–5–101.

Tenn. Code Ann. § 36–1–113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36–1–101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Mother is facing criminal aggravated child abuse charges. *See* Tenn. Code Ann. § 36-1-113(i)(6). While the Children have been in foster care, she has failed to pay any child support. *See* Tenn. Code Ann. § 36-1-113(i)(9). The relationship between the Children and Mother has eroded due to their long absence from her and they now call the foster parents "mama" and "daddy." *See* Tenn. Code Ann.§ 36-1-113(i)(4). The Children are thriving in their foster home, and the foster parents want to adopt them. It would be contrary to the best interest of the Children to be removed from their foster family. *See* Tenn. Code Ann. § 36-1-113(i)(5). We find clear and convincing evidence supports the determination of the trial court that termination of Mother's parental rights is in the Children's best interest.

## V. CONCLUSION

We affirm the decision of the trial court. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are assessed to the appellant, Amanda P.

_____
JOHN W. McCLARTY, JUDGE